Good afternoon, your honor. Thank you very much. It's a pleasure to be here. I'm Tim Sweeney on behalf of Tim Coleman and with me is my co-counsel John Parker. I would like to reserve five minutes if I could, please. This case, capital case, is about the ravages of illegal drugs and drug crimes and how the criminal justice system struggles sometimes very poorly to dispense justice in these cases, especially in communities like this one, Springfield, Ohio, plagued with poverty, despair, and neglect. These issues are presented in the context of the two issues we have here, which is the ineffective assistance of the sentencing phase trial counsel in this capital case and the Brady claim, the failure to disclose the information in that aspect of the claim. I'm going to start with the mitigation. This case is about prejudice. It's about prejudice. Was the ineffective assistance of these trial counsels prejudicial to Mr. Coleman? In our view, there's no question that it was. The judge was charged with making a moral judgment whether this, at the time, 27-year-old man should live or die for this crime in a case where the evidence of guilt was very weak and where the aggravation wasn't particularly aggravating in the grand scheme of capital cases. You had a mitigation phase performance in this case, which should, I think, for people who have seen a lot of these cases, as I know the judges on this court certainly have, was pitifully weak. Nothing was done for this man in his mitigation phase and the fight for his life to try to morally present an argument to spare him, to ask the jury to save his life. What was done? What was done? You had, I mean, the transcript here is really amazing because it's three or four pages, the mitigation phase of a capital case, three or four pages. You have one witness. You have the old man, the dad. Certainly the dad needs to testify at a minimum. If you read the transcript, it's one question, in effect, one question, which is effectively nothing. One question to the dad was the mitigation phase performance in this case, in a capital case, in a case where you had a lot to fight about. I mean, this case was weak to begin with. We know the courts have said the evidence is overwhelming and the evidence is compelling, but under any reasonable assessment of the evidence in this case, those are unreasonable determinations of the facts. This evidence wasn't overwhelming. It was predominated by snitches and drug dealers and people with angles. You know, this was very weak, this case. This was a very weak case as a capital case. You know, maybe as a regular felony, you might get past the Jackson versus Virginia standard, but as a capital case, this case was a weak case. It wasn't a case of overwhelming guilt by any stretch of the imagination. Not when you have Stephen L. Cassler as one of your witnesses. This was a weak case. And there was a lot that could have been fought about here in a mitigation phase that was properly developed and presented. You had the dad with the one juror. That alone, for anybody who's been a trial lawyer, knows matters. The mother getting up in front of a jury of 12 people and saying, I love my son, and I don't want him to be executed, will matter to one juror. And that's all you need here. The assessment of prejudice is a one juror standard. Is that all she could have said that would not be cumulative to what the father said? No. I mean, she could have said a lot more, Your Honor, other than I love my son and please don't execute him. Well, she could have talked about his background, some of his schooling, his dyslexia, some of the struggles he had. The father knew all this, too. But he didn't. He may very well have known those things, but he didn't testify about them. I mean, it's great if he knows them. It doesn't do any good to the jury if he knows stuff and doesn't talk about it, which is what happens when you have a witness who's unprepared. You tell the witness, which is what the record shows here. The witness was unprepared. The lawyer spent no time with him. That's unconscionable in a capital case. I mean, come on. We've seen so many capital cases in the last 20 years in the Sixth Circuit. And the court will grant relief. This case is Johnson, Gary Johnson. This case is Donald Williams. Those two cases are similar to this. They're one victim cases. They're cases where the crimes were relatively, and I don't mean to be offensive to anyone here, but were relatively routine cases of aggravated murder. The kind of aggravated murders that the prison is filled with people who have committed, hundreds and hundreds and hundreds of people, none of whom are on death row. In those two cases, Johnson and Williams, this court granted relief because they found prejudice. Because they found that doing nothing, which is what happened in Gary Johnson's case and Donald Williams' case, the capital defendant was prejudiced. Because there were things to talk about. There were family members who could have come in and said, I love this man. I don't want him to die. There were children who could have testified about their father. There were mental health professionals who could have come in and testified about the mental health issues that plagued that particular defendant. Johnson and Williams are controlling in this case, in our view, because they both found prejudice on records at least as, where this case, I believe, is even stronger than those two cases. And yet this Sixth Circuit granted relief in those cases. Capital cases out of the state of Ohio. One victim aggravated murder cases. Routine aggravated murders. Those cases are controlling here. What did the district court do? The district court in this case relied on a case called Morales. But it relied on the dissenting opinion in support of its argument that prejudice hasn't been shown. That's the wrong place to be looking. First of all, Morales got relief. They should have looked at the majority opinion. And Johnson and Williams are the cases that are controlling here because they are the kinds of cases that show the prejudice that can happen in this case. And that's really what the problem is here. You're asking a jury to make a moral judgment and you're asking them to do it without telling them anything about the human being they're being asked to judge. That's always, in my view, is always going to be prejudicial as long as you can show some things that were omitted. It doesn't have to be overwhelming because you're only trying to persuade one person. That's the standard. It's a one jury standard. And that standard can be easily met when you look at all that was omitted here. I mentioned the mob because I think that alone would have tilted the scale. I think you're already teetering here because it's such a weak case of aggravation that if you had had the mob, you may have tilted that just a little bit, just enough to persuade one person. That's all you need is one. Remind me, did the mob indicate that she would be willing to have testified if she had been asked? Well, here's what happened, Your Honor. She was evidently in the courtroom that day but was too emotional, according to the record, to come in and testify. And she simply did not. During the sentencing phase? During the sentencing phase, correct. In post-conviction? What about during the guilt phase? Did she testify? No, no, she wouldn't have been in the guilt phase. She wasn't relevant for that? She wasn't relevant, correct. She wouldn't have been relevant for the guilt phase and did not testify in the guilt phase. None of the family members did. Again, the guilt phase was four snitches and the four Strodes women. So the mother was physically or emotionally unable to testify at trial anyway. So what was defense counsel supposed to do since she was unable to testify? Was he supposed to ask for an adjournment so she could compose herself? What did he do wrong, asked the mother, since she was basically unavailable to testify? Well, right, that's what the record shows, that she was emotional. That's the problem. You don't have any time with them, who haven't developed any kind of rapport or confidence with them. This is inexcusable that you are the trial lawyers in a capital case and the mother is unable to testify. If that doesn't happen, you darn well better be asking for a continuance or you better be doing something to preserve that testimony. It's inexcusable to be in that situation where your client's mom is unable to testify because you as the lawyer failed to do your job to prepare that woman to be ready to do this on this difficult day. No question it's going to be hard. We all know that. If we're parents, we know how hard that would be for the mom to get up there in that situation. But she had to know. Do you think the judge would have granted a continuance if it had been requested? Certainly should have. Certainly should have granted a delay or a five minute break or an hour break or whatever it took to allow that woman to testify. That was critical. The failure to do that is unconscionable in a capital case. But that's not all that wasn't done. You had a sister who would have testified. And to your question, Judge Bush, the mom did testify in post-conviction that, yeah, I'd be willing to testify. And here's what I would have said. And she listed all of that. And some of those things I think would have been helpful and might have tipped the balance. But you also had the sister. You had Sonia, the sister, who did not testify but would have. And would have provided some other information about Tim Coleman. You would have had the mothers of his children. That was an important part of his life. People may scoff at that and say, oh, he didn't marry. So what? He cared for those kids. That would have been important perhaps to one jury. The jury isn't comprised of everybody who's been to law school or who are people who have, a lot of the people in this jury are just regular folks. And they might have been persuaded by the fact that this guy had four or five kids that he loved and he took care of. They might have been to work a job at Fox Light. It's a factory job. Not a big shot job. But he was trying to work that job at Fox Light. The jury didn't hear about that. Why not? They should have heard about that. They should have heard that this guy was trying to do some decent things in his life. Was he involved in dealing drugs? That certainly was the argument. That was the case here. But that doesn't make him a murderer. And even if they believed he was somebody who killed, there were arguments that could have been made in this case that would have humanized him. That's the challenge in a capital case because you're trying to humanize your client. You're trying to present to the jury reasons to spare his life. To make them see him as a human being, not as somebody that they've already found guilty of murder. There are ways to do that if you're persuasive and if you're an advocate. The duty of an advocate is to advocate. It's not to just throw your hands up and do nothing. The mom is in the hallway. Oh, well. I guess there's nothing we can do about that. You've got to be prepared. You've got to be committed. You've got to advocate. That's your job in a capital case. You're fighting for this man's life. He's been sitting on death row now for 22 years for a crime he says he didn't commit. And he may very well be right. Who was there to fight for him? It sure as heck wasn't these lawyers. Any fair assessment of the job they did, there's no question. In the sentencing phase, deficient performance, no question. That's Johnson. That's Wilson. Those cases this court should follow. There should be some consistency in these cases. When you look at capital sentencing, there should be some consistency. Tim Coleman was found guilty of a terrible crime. He was found guilty of a terrible crime. But there were things you could say about Tim Coleman that might have talked about the mother's testimony helping to humanize the defendant. People that love him, that testimony helps to humanize him. The flip side is if you have the mother and the sister and the other loved ones not coming forward, people are wondering, the mom won't even stick up for this guy. That kind of thing can hurt you. So you've got to do that. You've got to make those efforts. And you also have the psychiatric stuff. You've got psychological evidence in this case. It was pretty compelling. The courts have looked at it and said, well, the psychiatric evidence just fits within the state's theory of motive that he was somebody who was anxious conformity to the expectations of others and he was rigidly moralistic and he was, you know, see things as black and white and he blames others for things he does and he was diagnosed with this compulsive personality disorder. The arguments from the So what? He's already been found guilty. Doesn't matter if it's consistent with the state's theory of motive. You've got to now explain to the jury, you found this man guilty. We don't agree with you. But you've done that. All right. Now here's some reasons why what you found happened may very well have happened. Here's some humanizing reasons that might make sense as to why this happened. It was smacking them all right in the face. One of them was, you know, the notion of strong provocation here. The defense lawyers in this case chose to rely on strong provocation and duress as the mitigation theory they wanted to pursue. Well, the best argument is you've got the victim here who is somebody who loves you. Think about that. The victim is somebody who cares about you and loves you and they got right to kill. No. But it humanizes that man. It makes you think. Well, yeah. This is a little more complicated than the state's trying to make it seem. This is a little more complicated. There's a little bit more of a moral judgment here becomes a little different when you have somebody who betrayed you in that way. It's not to say the woman deserved to die. None of that. But it helps to explain why somebody with compulsive personality disorder might have committed a crime like this. This would have all come in through the psychologist? That, sure. Right? Also through... What's in the record in terms of the admissibility of that opinion? The opinion about the compulsive personality disorder, Your Honor. Well, I think that would have come in. I mean, I don't think there's been an argument made that that wouldn't have come in. I just think the argument's been it's not helpful. And it would have been consistent with the state's theory of why things happened. And my, our response... Is that a Daubert standard? I'm sorry? Would there be a challenge? Is there anything about it being challenged on that ground? There was no, no. Here's the issue. I think you may be thinking. One of the arguments that has been made is one of the things the doctor might have testified to is this person is nonviolent. That's another point, though. That evidence would have come in. I mean, not to prove that he didn't commit the crime. You can have nonviolent people commit murders. But that goes to strong provocation. That evidence would have been admissible had an argument been made for its admissibility that was consistent with the theme of mitigation, which is the theme they chose to pursue, which is that there was duress and strong provocation. They just pursued it so ineptly and so incompetently and without any care for their client. That evidence and that argument was persuasive because it humanizes Tim Coleman. This case is about two people who knew each other and cared about each other and evidently loved each other, according to her. This is her words, the victim, seeing him. Oh, hi, I love you. You're my friend. We know they were in a relationship of some sort, some sort of sexual relationship. He was even supposed to go see her that night later at two in the morning. So they were friends and they were lovers and she betrayed him. If you're a person with compulsive personality disorder and also a person who's nonviolent and not inclined to commit this type of a crime or to be a violent person, doesn't this speak to the strong provocation, the strength of the provocation that would exist here? And that's a mitigating factor in Ohio. That's the statute. That mitigating factor comes from the statute. That's B-2. The trial lawyers got up in closing and said, we're asking you to rely on B-2. The Ohio Supreme Court on direct appeal, yeah, we're looking at B-2. That's what you guys looked at, what you, the trial lawyers, argued. But they didn't do it. They didn't do it. I mean, what did they do? They didn't do anything for this guy. And there were things you could do for this guy in this case. You're trying to humanize a man, a human being, and you're trying to persuade a group of jurors that you ought to do this. The proof, I think, of the pudding is just in how weak the case is. Because any assessment of prejudice in this case or in any case, and this is Strickland, has to be seen through the prism of how strong or weak the case is. Strickland says that. A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. That's Strickland. They also make that point in Wiggins. Those are capital cases. This case is weak. I don't have to go through it again. We went through it in the brief. But the evidence against Tim Coleman was jailhouse snitches who said he said certain words. And people who were vulnerable people, the Strodes women, who James Strodes, their relative, was also a suspect in this case. They were drug users. These people were all vulnerable people. They were easily persuaded to say things that they may not have been true. It's certainly an argument. It's certainly an argument that could have been true. Certainly a lot of them, though, right? They might be snitches and they might be not the most outstanding people in the community, but he's got, I mean, the prosecution had a lot of witnesses that had his statements about him saying, I'm going to kill her, and then statements that I did kill her. And then you've got the witness who is with or sees him walk down the alleyway with the victim right before the killing. I mean, you've got a lot of statements, circumstantial evidence. You don't have direct evidence. No, you don't. And I think having a lot of something doesn't make it good. It's still a quality. You can have ten people coming in and saying the earth is flat, right? But they're all wrong, even though there may be ten of them. And I think that's the problem here. You really do have, and the witnesses here are worse than weak. I mean, this is really a, this is a capital case, and this is what they've got. And the other thing to point out. It's hard for us on appeal to evaluate the credibility of the witnesses. That's why you have the trial. Understood. That's why the jury looks at them and sees them face to face, and the judge is there too. It's not really our business on appeal to assess credibility. Well, that's true. I agree. It's not your business on appeal. But you can assess in determining prejudice, in determining the extent to which the failure to argue and to try to humanize the defendant, to the extent that it prejudices him, it ought to be a factor to be considered. Including the fact that from the very beginning, he denied this. And there's no evidence against him other than other people saying he said stuff. That is it. And then you have some of these other strange things, which I think you could consider. These shell casings showing up two weeks later. It's a capital case. There were police officers saying they're out there on their hands and knees going through the snow with metal detectors, and they didn't find these shell casings. But two weeks later, there they are, shell casings sitting on the snow. Come on. I mean, finding the clothes in the snow. None of that's linked to Tim Coleman. None of that's linked to this crime. Nobody ever asked him to try that stuff on. I mean, this case is pitifully weak. It's not to say this is a Jackson challenge. It's not. We're here on a prejudice claim and an ineffective assistance counsel. And in a capital case, and if you look through the prism of prejudice and you say, okay, could one juror have been persuaded to spare this human being, this points that I'm making right here today, would one juror have been persuaded? Oh, my goodness. I think, yeah. I don't think there's any question one juror would have been persuaded to say, you know, we found that he did this. But the different question, the moral question about whether he should die for this, that's different. We think that should not happen and we're disagreeing, or at least one of us does. Have you ever seen the movie The Informer? Great some of this, the fraught humanity and the difficult moral questions about informers. Those arguments weren't made here. But that really humanizes Tim Coleman when you look at the psychiatric profile he has, that he was convicted of killing somebody who loved him because of this portrayal. Think about that. I mean, these are two people engaged, if the jury is believed, engaged in the same criminal acts. They're both selling drugs. And what the victim did is went to the police and behind his back set him up. So he would go to prison instead of her. So her five kids would have a mother at home and his five wouldn't. Their father would be in prison. You know, for a person with his psychiatric profile, compulsive personality disorder, you know, the strong anxious conformity to the expectation, those are the kinds of things that matter. I mean, we know this as human beings. We know what persuades juries. We know that kind of stuff would have mattered. And the duty of an advocate, as I said at the beginning, is to advocate. And if the court looks at the totality of all the omitted evidence, the stuff that could have been presented, the psychologist, the work records, the children, the mothers that loved, the mothers of the moms, you know, a cultural expert who could come in and talk about some of these issues, all of that, the totality of that, and the question, if the question becomes, which it is, the legal question, is there a reasonable probability that one juror, one, only one, would have been persuaded to spare this man's life? Had that been done and had the advocacy been effective, had somebody gave a darn about this guy and hoped he lived, the answer is yes. One juror would have cared enough to say, no, we're not going to kill this guy for this crime. And he wouldn't be on death row 22 years later for a crime he claims he didn't commit and he may very well not have committed. You know, how does he ever get that back he doesn't? And that brings us to the Brady claim I only have a minute or two. The issue there is, why has nobody wanted to hear from SAP? You know, I mean, here's a guy who comes forward and says in an affidavit, writes it out, swears it out. He didn't write it. It was written by the lawyer, the public defender lawyer, signs it, says I committed this crime. There's some bit of detail, detail that he otherwise probably wouldn't have known. The evidence in the record is that Mr. Bodine, the lawyer that got the affidavit, then went back a couple of weeks later just to make sure, you know, we're going to be filing this. Is he okay? Yeah, he filed it. Nobody wants to hear from him. I mean, that's a problem. He should have gotten a hearing. A determination made without a hearing on this record is an unreasonable determination of the facts. It's an unreasonable determination of the facts. He should have gotten a hearing. The court should have, either the state court or the federal court below, should have allowed a hearing to hear what Mr. SAP had to say and to hear the contrary evidence that he's lying. Because that's the thing that's troubling about this capital case. You know, Judge, I mentioned all these witnesses, these snitches and all. Right? I know. There was a lot of them. But Tim Coleman's had witnesses like that too on his side. You had the Stoets guy who said the trial lawyer told him I went through the motions because Tim's a, you know, he used a racial term. You had SAP. You had the Mr. Love in post-conviction. Let me ask you, what about Ms. Timmons? Timmons, right. Is she available as a witness? I believe so. I believe she's still. Anything in the record from her as to whether she had a friend named Stevens? Whether that, whether she actually had a friend named Stevens? I don't think there was anything in the record on that other than just the fact that the letter is in the record and that this murder did in fact occur off pleasant. I don't believe Ms. Timmons was deposed or testified. She may have been in prison. I just don't know the answer to that, Your Honor. But there is sort of a double standard here. You've got all these witnesses like SAP and Stoets and Love who say things that support Tim Coleman. That's not credible. We don't have to listen to those guys. Then you've got the likes of Steven Kassler who somehow allows courts to conclude there's overwhelming evidence. Eh, that's not right. All right. Mr. Sweeney, Brady claims somewhat unusual because the confession did not occur until after the trial was over. I know the appeal was still going on. But in a habeas setting, you have to show that the ruling of the state court was against clearly established constitutional law as established by the Supreme Court. Has the Supreme Court established that a Brady violation can occur with evidence that occurs after a trial? I think that's a due process clause thing. I think we can always begin and end there. But I think Pennsylvania v. Ritchie is a helpful case on that. I think that case, which is 1987, U.S. Supreme Court, they talk about Brady. The duty to disclose is ongoing. It extends to all stages of the judicial process. Information that may be deemed immaterial upon original examination may become important as the proceedings progress. You know, I think that suggests, if not holds, that as long as it's still not final. Different standard than Brady? I mean, you say it's due process. It's a due process box rather than the Brady jurisprudence box? I think Brady is a due process. I think that is a due process issue. I do believe that's where Brady emanates from. It's a due process holding. I believe that's right. I understand the Osborne case. I think the Osborne case, though, talks about when the case is closed. Well, I mean, here, because the trial's over, we'd almost have to look at whether this, if you call it Brady evidence, would have had an effect in his appeal process rather than the trial process, right? Well, it... I mean, normally, Brady you look at, well, could it, would it, could it have had an effect on the verdict? Well, the verdict's already there, so I think you'd almost have to say, would this evidence have an effect on his appeal had it been timely disclosed on his appeal? And that seems like a different, different analysis, isn't it? No, I think the analysis still would be, would it have made a difference to a jury? And I think... Well, I mean, how could it? Because the jury had already made their decision, and this evidence wasn't even in existence. It's sort of like the same thing, and I don't pass my time, so I, if it's okay if I answer. Yes, please. It's sort of like the same thing we do, or we're asking you to do in the context of the ineffective assistance. You're being asked to assess prejudice and what impact it would have had on the verdict. It's the same type of analysis. I think it's got to be prejudice on the appeal, not the verdict, that's all. I'm not sure about that. Here's my answer to that. I think regardless of which proceeding you look at it in terms of prejudice, I think Coleman prevails either way. Okay. Mr. Sweeney, you'll have your five minutes for rebuttal. Any questions, Judge Batchelder? No, thank you. Any other questions, Judge Batchelder? Government? Good afternoon. Good afternoon, Your Honors. My name is Margaret Moore, and I represent the warden, Margaret Bradshaw, in this case. The district court correctly determined that the inmate in this case, Mr. Coleman, was not entitled to habeas relief on his ineffective assistance of counsel during mitigation phase claim. The inmate claims that there was a constitutionally deficient investigation and presentation of mitigation evidence, and the district court was incorrect in their application of the AEDPA standard. While the court did not wholly ignore the state court's opinion, they ignored the AEDPA standard under D2 and E1 and substituted their own judgment for that of the state court. There's nothing in the record that shows that they met the burden of clear and convincing evidence to overturn the state court's reasonable decision that the first prong of Strickland had not been satisfied by the inmate. Strickland is a two-prong test, and the inmate must show both that the counsel's representation fell below the objective standard of reasonableness, and then that the deficient performance prejudiced them in their petition. The court must also have a strong presumption that the counsel's conduct falls within the wide range of reasonable professional assistance, and the judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of the attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time. This is a doubly deferential standard. The question is not whether counsel's actions were reasonable, it's whether the state courts got it right. Whether their adjudication resulted in a reasonable decision under clearly established federal law, or it was a decision based on reasonable determination of the facts presented in state court. The district court found that the trial counsel was deficient on the performance prong of the test, and we disagree for the fact that the trial counsel hired an investigator, which was Dr. Eimer. Dr. Eimer billed approximately 30 hours, I think 27.6 is the actual number of billable hours. He spoke to Mr. Coleman for 8 hours specifically. He also had another investigator which was Mr. Belcher, not assigned to the mitigation, but that investigator investigated the facts of the case and found some inculpatory facts rather than exculpatory facts. Dr. Eimer was a clinical psychologist, and that personality disorder that my colleague spoke of is one that was found to be inconsistent with violent conduct. That caused him to not take responsibility for his actions and to blame others for them. In fact, he found that Mr. Coleman typically does not assume responsibility for his problems and tends to blame others, which is consistent with what he did with Melinda Stevens, the victim in this case. The district court below cited the Ohio Court of Appeal during post-conviction relief in saying that the record does not support that further investigation would have produced any more mitigating evidence. This strong expectation to conformity in this personality disorder that my colleague spoke of would likely not have assisted Mr. Coleman in his mitigation because the person that got up and spoke on his behalf, his father, Mr. Coleman, spoke of a loving childhood with an intact family, a sister and a mother that were in his life. All of these things could have been held against him rather than acted for a juror to vote against the death penalty. The record also reflects that it was a strategic decision by trial counsel to not call Dr. Eimer to the stand, likely because this testimony would not have been productive in mitigation. It is very possible that the jury could have found that they would hold this information against him rather than for him in voting for the death penalty. Throughout his trial, he used the good guy defense. He's a good guy that didn't do this. He's actually in a sense disregard the overwhelming amount of evidence that was presented against him and that the jury considered in convicting him. All of that evidence was also admitted during the mitigation phase. Again, this was a strategic decision that's made on the record, not in the presence of the jury, but to the trial court. The trial court inquired to counsel if this was a decision that he had made consciously and he stated it was. Additionally, the trial court during sentencing stated that Coleman's background did not contribute to his becoming a violent criminal, that this was a conscious decision, that he set his own standard of performance, acceptable behavior in choosing a criminal lifestyle. For all those reasons, we believe that the district court below decided wrongly in saying that there was deficient performance. What was the reason of not calling the other family members, the mother and the daughters or children or whatever? Trial counsel on the record stated that the mother was present in the courthouse, as my colleague had said. They argued that you should have asked for a continuance. The mother was important. What's wrong with that argument? The warden's position is that it would have been cumulative evidence, that the mother would have stated the same things that the father did. He came from a loving household. He was a happy and energetic child and that his conduct was not indicative of his background and growing up in that family. I mean, the testimony that was presented was very meager, don't you admit? I agree, your honor. The warden concedes that there was only one witness called, but that There wasn't much presented, right? There were, I think, nine questions asked of that witness, several of them to show who the witness was. I really question the deficiency of the performance, because it does seem like counsel could have done a lot more. The focus we have, I guess, is whether assuming there was deficient performance that counsel probably should have done more, was it prejudicial? I think that might be a stronger position. Thank you, your honor. Moving on to the second prong of the Strickland test. All of the courts along the way have stated that Mr. Coleman was not prejudiced by his trial counsel's performance. Again, this is a doubly deferential standard and we need to recall that under the state court was reasonable under the clearly established law or if the conclusion was reasonable as applied to the facts. The strategic decisions that were made by trial counsel were reasonable from the factual record in all state proceedings. This is consistent with their defense of actual innocence, that he was a good guy, this was a blip on the screen for him. It would be inconsistent for him to stand up and say, to his actual good guy defense, for him to stand up and say, even if you believe I did this, I should be mitigated against the death penalty for all these reasons. The district court used the Morales opinion, as my colleague stated, to show the difference in the mitigating evidence. What would have come out in Mr. Coleman's case is that he had two parents, he had a sister, he was in a loving home, he had family members that were available in his life, his children's mothers and his children. The Morales case to show the differences, that man had a not intact family, he had a brother that committed suicide, a sister that was institutionalized, and facts such as that. All of these facts were not presented in the Morales case and likely would have helped him in the mitigation, whereas the jury could very well have held Mr. Coleman's loving family against him in holding that he consciously acted in this criminal fashion in murdering Melinda Stevens. What about the argument that Mr. Coleman's counsel is making that the theory actually would have been he was a good guy, but that he's a jilted lover or his lover has betrayed him. That would have been the justification that would have been offered. What do you have to say to that? Wouldn't some of this testimony have gone to that? The testimony, the warden's position is that it wouldn't have gone to that. It would have shown that he was acting in the same way that the clinical psychologist said, putting the blame on others, not taking responsibility for his own actions. Saying that the victim in the case, Melinda Stevens, was the one that wronged him, rather than taking account for his drug dealing past, which is what she was intending on testifying against him with. As my colleague said, there were only two of the seven mitigating factors that were talked about in the jury instructions. The conversation between trial counsel and the trial court regarding the strategic decisions occurred before the jury was instructed on the mitigating factors. The dialogue considered the other things that could have been brought out by the trial counsel. Trial counsel stated on the record that it was his professional opinion that the defendant himself should not testify on his own behalf, which is another part of the mitigation that did not occur. Additionally, the mothers of his five children could have testified. However, Dana Strode, one of the three women, would have likely testified on cross-examination to his propensity for violent conduct. She had been shot at him, which came out in a post-conviction relief affidavit of one of the detectives in the warden's position is that all of this information that could have come out would have been cumulative and thus would not have prejudiced him, in addition to the fact that the jury, all of those jurors, could have held the facts against him and said, you had all of these opportunities that most offenders wish for and you chose the criminal lifestyle that got you into this situation. So additionally to what my colleague stated was that the mom could have testified and talked about the learning disability, the facts in the record state that the mother was present and the trial counsel did not call her to the stand because she was too emotionally distraught to testify. In the preparation of the witnesses that my colleague talked about, Dr. Eimer was prepared to testify. He again billed several hours, spent eight hours with Mr. Coleman himself and did not testify because the trial counsel made that strategic decision for him to not testify. The deference given to trial counsel for their strategic decisions is great. Another case in the Sixth Circuit that is similar in strategic decisions is the Cowens case in which little to no mitigating evidence was presented as a strategic decision made by the defendant in that case and that was upheld in the habeas under the deference. Pending any further questions on that issue, I'll move on to the Brady claim. So the warden's position is that the district court properly determined that the inmate was not entitled to habeas relief on his Brady claim because no Brady issue existed at the time of trial. The Brady duty is not ongoing. Mr. Coleman's claim is that it is ongoing duty even after trial and that is contrary to law and an unreasonable application of the facts in this case. Not only was the trial over, it concluded on February 18, 1997. The verdict on April 2nd and 3rd, 1997 and then the letter, the undated, very vague letter that is referenced in the briefs came out in the newspapers 17 months later and Mr. Coleman had that in his possession. The burden is on Mr. Coleman to produce the evidence extrinsic to the record for this. Mr. Sapp, William Sapp, the man that he talks about has an ongoing federal habeas claim. That interview is readily available. Mr. Coleman had the opportunity and the ability to get that information and has not produced it. The warden's position is that neither the interview nor the letter are exculpatory to Mr. Coleman in any fashion. The letter is very nonspecific. It is not undated. It states a woman over off Pleasant. That is in the general area of Springfield where this murder occurred of Melinda Stevens but probably likely all of the Springfield criminal activity is in the same general area. Again, it is the inmate's duty to present evidence to bolster his Brady claim and he has not done that. You say it is not a Brady claim but is it a due process claim? The warden's position is that it is not a due process claim because there is no exculpatory information in it. If there were then we would evaluate it for due process? Your Honor, it would change the argument if it were. How would we evaluate it then? We can't say whether it would affect the jury's verdict since the jury had already done their verdict. Do we evaluate whether it would have affected his appeal? What do we do? Hypothetically, if it were exculpatory material, I don't know that there is case law to say that it is a due process claim but I think there probably is a duty to turn over that information but the facts in this case are that it is not exculpatory and it is not a Brady claim and that is the argument being made by the position. The state courts ultimately did consider it? Yes, Your Honor, the state courts considered it. Delay in producing it was harmless? Is that the argument? Your Honor, there is no delay in producing it. Assuming there was, assuming the government knew of this alleged confession and then waited for a period of time as alleged to alert Mr. Coleman of it, is that the argument that there in the hypothetical situation where it is exculpatory, there would likely be a prejudice and the warden's position is that it is not a Brady claim and they don't win on this but the hypothetical, there is likely a duty to turn that over whether that is a legal duty or a Brady claim is a different question, Your Honor. As a former prosecutor, there is a duty if there is exculpatory information but in this case there is not. And pending any further questions, I'll sum it up with the warden would like to ask this court to uphold the decision of the district court and find that this inmate is not entitled to habeas relief on either of these grounds because he does not overcome the doubly deferential AEDPA standard. Thank you for your time. Judge Batchelder, do you have any questions? I do not. All right, we've got five minutes rebuttal, Mr. Sweeney. Thank you. Thank you, Your Honor. Just briefly on that Brady or the due process issue, just to recap the timing, this interview was April 2nd or 3rd in 97 between the two officers. The sentencing opinion in Coleman's case was released I think March 3rd, so you're still within the 30 days. There's also the opportunity to file a motion for a new trial, which would have brought this in as well. You're really right up there. I mean, this is not, you still have time to file your notice of appeal. I don't think it even ran. If it had, it was right about there. So this is a significant thing. And the thing that's so troubling about it is that no one has taken the time to hear from SAP. I mean, there should have been a hearing here. That's what should have happened. And I don't think Coleman would be here making an argument if he had had a hearing and after a hearing it had been ruled against him or ruled in his favor. Who knows what would have happened at a hearing. But SAP made a pretty detailed confession. It's not incredible to believe that SAP may have killed this woman. He's killed three or four other people. And he's from Springfield and he's in the drug culture and he very well could have done this too. And Tim Coleman's maintained his innocence from day one. So that's an important issue. Let me back though to the issue on the ineffective assistance of counsel. I heard the argument that no court has found that this was prejudicial. We're here in this court though. This is the Sixth Circuit Court of Appeals. This is an important, powerful court, a prestigious court. Gary Johnson's case, he didn't even get a COA in the district court on his claim of ineffective assistance of counsel and mitigation. He didn't even get a COA. He had to come to this court to ask for a COA. This court said, yeah, we've got to hear these issues. And one of the issues was ineffective assistance of counsel and mitigation. And the arguments were made to a panel of this court. This court listened, granted relief because the court found prejudice, even though none of the other courts found prejudice. And the district court below didn't even think it met the standard for a COA. This case is like Johnson's. It's worse than Johnson's because they didn't do anything here. And there was a lot to fight about here, as I mentioned before. The language of the court in Gary Johnson's case is helpful because they talk about the omitted mental health evidence, which is kind of similar here. It was a personality disorder in Gary Johnson's case. In this case, it's a compulsive personality disorder, a compulsive, obsessive compulsive disorder, kind of a comparable type of mental health diagnosis. The court said the fact that he suffered from this, quote, although not absolving him of responsibility for his crimes, helped explain why certain circumstances would be viewed by the petitioner in certain ways and would prompt certain abnormal responses. That's exactly the kind of argument that could have been made here with the testimony of Dr. Imer about Tim Coleman's unique, fascinating because the doctor called it fascinating, psychological profile. That's what he said in his affidavit and post-conviction, that this man has a fascinating, psychological profile and he really wished he could have been able to testify about it. That's him. That's Imer. And had he done so, he would have been able to make the kind of points we're talking about here that would have persuaded just one person. And that's the point the court made, this court made in Johnson. After every other court said no prejudice and after the district court said I'm not even giving you a COA, this court said nonsense. This would be prejudicial and here's why. And this case is no different. Tim Coleman's entitled to the same relief that Gary Johnson got. And so just to sum up, we have a young man at the time who was 27 years old. He was trying. He'd had a job. He'd injured his shoulder. He had these mental health challenges that made, kind of uniquely, might have made him some good evidence about how he behaved in the jail. He had a mom who could have testified about that she still cared about him despite all of this. He had all of these things and none of it was presented. The jury didn't hear. They weren't able to ever accurately gauge his moral culpability for this crime and that's a shame. That's a shame because if they did, at least one of them would have said, even though we think you did this because that's what they had concluded, you don't deserve to die for this. And he wouldn't be on death row and that's the relief he's entitled to. He's entitled to, we believe, respectfully from this court, that the court grant relief, reverse the denial of relief, in order that the state provide a new sentencing hearing for this man. And if there's no questions, thank you. Alright, any further questions? Judge Batchelder? No, thank you. Alright, Mr. Sweeney, thank you. I noticed that you're appointed pursuant to criminal justice act. I want to thank you for your service to Mr. Coleman and to the court for your presentation. Thank you. Good job. Alright, that concludes the docket this afternoon. The case will be submitted.